**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

No.: 1:16-cv-2037

DAVID SPEISER, Individually and On Behalf of All Others Similarly Situated,

Plaintiff,

v.

PHILIP A. EPSTEIN,
LANCE PETERSON, and
JAMES A. WATT,

Defendants.

---

**CLASS ACTION COMPLAINT AND JURY DEMAND**

---

Plaintiff David Speiser ("Plaintiff"), by and through his attorneys, for his Class Action Complaint against defendants Philip A. Epstein, Lance Peterson, and James A. Watt ("Defendants"), on behalf of Plaintiff and other similarly situated individuals or businesses who purchased common stock of Warren Resources, Inc. ("Warren" or the "Company") between November 4, 2014 and June 2, 2016 (the "Class Period"), alleges as follows upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters. Plaintiff bases his belief upon information uncovered through an investigation by Plaintiff's counsel that included: review of Warren's public filings with the Securities and Exchange Commission ("SEC"); review of Warren's press releases and other public statements;

and review of regulatory filings and reports, court filings, securities analyst reports, and media reports about Warren.

## INTRODUCTION

1. Warren is an oil and gas company that in 2014 doubled its development and production capacity through an acquisition that left it highly leveraged and highly vulnerable to negative changes in the market price for oil and gas. Each of the Defendants acted as the Chief Executive Officer ("CEO") at certain times during the Class Period, and issued a series of false and misleading statements to hide the fact that lower energy prices were having a disastrous effect on Warren. Defendants repeatedly represented that Warren was "well positioned" to "ride out" and "successfully navigate" the "market fluctuations," when, in fact, Warren was becoming increasingly insolvent. Warren filed for Chapter 11 bankruptcy on June 2, 2016.

## JURISDICTION AND VENUE

2. The claims asserted arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§78j(b) and 78t(a)], and SEC Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5]. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa] and 28 U.S.C. §§1331 and 1337. Venue is proper pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b). Warren's corporate headquarters are located in this District, and certain of the statements alleged herein to be false and misleading originated from this District.

3. In connection with the acts alleged in this Complaint, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including without limitation the mails, interstate telephone communications, and the facilities of the national securities exchanges.

## THE PARTIES

4. Plaintiff purchased Warren common stock at artificially inflated prices during the Class Period, as described in the certification filed herewith, and was damaged thereby.

5. Defendant Philip A. Epstein ("Epstein") was Warren's Chief Executive Officer and Chairman of its Board of Directors from December 2012 to December 2014.

6. Defendant Lance Peterson ("Peterson") joined Warren's Board of Directors in August 2014, served as Interim Chief Executive Officer from December 2014 through November 2015, and continued to serve as a director thereafter. Peterson co-founded Citrus Energy Corporation ("Citrus") in 1989, and has served as CEO and President since its formation.

7. Defendant James A. Watt ("Watt") has served as a director of Warren and the Company's President and Chief Executive Officer since November 2015.

## DEFENDANTS' FRAUDULENT SCHEME

8. Warren is an energy company that develops and produces onshore crude oil and natural gas reserves. Prior to 2014, Warren primarily operated an oil recovery property in the Wilmington field in south Los Angeles, and natural gas properties located in Wyoming. On July 7, 2014 Warren announced that it had agreed to buy a position in the hydraulic fracturing Marcellus Shale gas region in northeastern Pennsylvania from Citrus for $352.5 million, consisting of $312.5 million in cash and $40 million in Warren common stock, with a valuation of $6 per share. Peterson, a co-founder of Citrus and its President and CEO, also joined Warren's board of directors. The deal was effective, for economic purposes, as of July 1, 2014.

9. The Citrus acquisition was a transformative deal for Warren, as it doubled the Company's reserves and tripled production. However, the acquisition would also greatly increase the Company's sensitivity to market fluctuations for natural gas, and Warren's debt would dramatically increase, as the Company funded the cash portion of the Citrus purchase by

issuing $300 million of senior unsecured notes. The notes were due August 1, 2022, and bear interest at 9% per year, payable semiannually in arrears on August 1 and February 1 of each year, beginning on February 1, 2015.

10. Natural gas prices, which were at a multi-year high of nearly $8 per MBTU (one million British Thermal Units) at the beginning of 2014, had slid to the mid-$4 range by early July 2014, and then slid into the $3-range shortly after Warren's announcement of the Citrus deal.

11. The months following the announcement of the Citrus deal saw increased volatility in the natural gas market, and increased pricing pressure on the Company's common stock.

12. By November 2015, natural gas prices had slipped into the mid-$3 range, and the Company's common stock had dropped to near $3 per share. In other words, in the months following the announcement of the Citrus deal and the Company taking on far more risk to natural gas prices and far more debt, Warren had lost half of its market capitalization. Facing further instability and the threat of insolvency and how that would accelerate certain rights of the Company's debtholders, Warren's top executives embarked a scheme to make a series of false statements regarding the Company's ability to cope with unstable natural gas prices.

13. On November 4, 2014 (the first day of the Class Period), Warren issued a press release to announce its third quarter 2014 financial results, which were the first financial results that fully included the Marcellus Shale operations. Epstein was quoted in the press release addressing the market pressure:

> "While there has been significant volatility in energy commodity prices and capital markets, Warren has over $100 million of liquidity and will continue to focus on growth within cash flow. Warren is well positioned to ride-out market

> fluctuations while maintaining financial flexibility to execute on attractive growth opportunities.

14. This was the first time the Company had issued any public statement regarding the drop in natural gas prices. At the time, Warren was highly leveraged and not "well positioned to ride-out market fluctuations." Warren had just $1.8 million in cash and cash equivalents, and had already tapped $120.7 million under its $225 million credit facility. Warren tapped another $10 million under that facility in the four weeks following the November 4 announcement.

15. On December 5, 2014, Warren announced that Epstein resigned from his positions as the Company's CEO and Chairman "in order to pursue other opportunities." Peterson became the Company's interim CEO.

16. Though technically listed as "interim" CEO, Peterson entered into a compensation agreement with the Company that provided him with a base salary, bonus and benefits slightly higher than what the Company had provided to Epstein.

17. When the Company released its fourth quarter and 2014 year-end financial results on March 11, 2015, Peterson continued the prior false representations regarding the Company's ability to ride-out market fluctuations. Peterson stated that "[w]hile there has been significant volatility in commodity prices and the capital markets recently, Warren has an asset base well positioned to successfully navigate the current market environment."

18. About one month later, Warren announced that one its directors, Thomas G. Noonan, had notified the Company that he declined to stand for re-election to the board at the next annual meeting, and that Warren would reduce the size of its board rather than fill the vacancy.

19. The Company's financial position continued to deteriorate into 2015. Warren's lenders cut the credit facility from $225 million to $167.5 million, of which the Company had drawn $157.8 million as of March 31, 2015. Warren was able to make the semi-annual interest payment on the $300 million senior notes, but was incurring more debt to do so.

20. Peterson continued to falsely tout the Company's ability to withstand the then current market for lower natural gas prices. In a May 7, 2015 press release announcing first quarter 2015 financial results, Peterson stated that "Warren has responded to a volatile commodity market environment and has taken action to position the Company to weather these challenging times."

21. On June 16, 2015, Warren issued a press release to announce that it had entered into an agreement to sell a portion of its Wyoming operations for $47 million in badly needed cash.

22. On July 14, 2015, Warren issued a press release to announce that it had hired an executive search firm to locate a new CEO, thus signaling a desired end of Peterson's executive position at the Company.

23. By the end of June 2015, Warren was still bleeding cash. The Company successfully engaged in a bond exchange where $300 million in face value 9% senior notes were exchanged for 9% new senior notes at $230.4 million. It secured a new $250 million credit facility to pay off the prior credit facility, but had already tapped the new facility for $219.7 million borrowed.

24. Peterson knew that the Company was burning through its cash and teetering on the verge of insolvency, yet continued to make false statements. On August 4, 2015, for instance, the Company issued a press release where it announced second quarter 2015 financial

results, and stated that "we believe that the Company is well positioned to weather current commodity market conditions while capturing opportunities in our core areas."

25. Notwithstanding the repeated positive news issued by the Company, the truth of Warren's dire financial condition began to emerge.

26. On November 3, 2015, Moody's Investors Service issued a downgrading for Warren, stating:

> The downgrade reflects our view that although the second lien transaction and the distressed exchange marginally improve the balance sheet, sustained weakness in commodity prices make Warren's capital structure untenable. Absent a sustained commodity price recovery, Warren's liquidity will remain stressed and will result in further erosion of the asset value due to Warren's inability to invest in growth.

27. Moody's explained its downgrade stating:

> Warren's Ca CFR reflects its unsustainable capital structure and extremely poor expected recovery relative to its asset value given the commodity price environment and Moody's industry outlook. The company's weak liquidity, elevated leverage metrics, small scale and limited prospects for reserves and production growth leave little room for improvement in asset value. Moody's expects Warren's EBITDA to interest coverage to fall toward 1x and retained cash flow to debt to drop below 3% through 2016. Furthermore, Warren's debt-to-average daily production should range between $28,000 and $30,000 per barrel of oil equivalent (boe) per day, and debt-to-proved developed (PD) reserves to exceed $12 per boe over the next 12 months. Warren's rating is also impacted by its highly stressed liquidity situation that will require further capital infusions in addition to operational cost savings and proceeds from asset sales; however, there are potentially few meaningful options to shore up its liquidity.
>
> Warren's SGL-4 liquidity rating indicates weak liquidity through 2016. At June 30, Warren had approximately $15 million of cash on the balance sheet and $30 million available in the form of delayed draw term loan. We expect Warren has utilized some of this liquidity through third quarter 2015 to meet its liquidity needs. Pro forma for the second lien term loan transaction, Warren received $11 million of new money to add to the existing liquidity. In the current weak commodity price environment, without significant operational expense reductions or asset sale proceeds, we do not expect Warren to generate sufficient cash flow from operations to cover the debt service and maintenance capital expenditures.
>
> The terms of the second lien term loan allow Warren to defer up to half of the second lien interest burden by capitalizing accrued and unpaid second lien

> interest. However, Warren's on-going liquidity needs through 2016 create a high likelihood of Warren exhausting its available liquidity in 2016, hence requiring a liquidity infusion either in the form of additional debt or equity. The first lien term loan requires Warren to comply with the leverage covenant ratio of not greater than 5.5x at the end of 18th month (approximately year end 2016) from the closing of the first lien term loan facility. Warren is likely to breach this covenant.
>
> Warren's senior unsecured notes are rated C, which is one notch below the company's Ca CFR. This notching reflects the priority claim given to the first lien and the second lien term loan facilities.
>
> The negative outlook reflects our assumption that Warren's leverage will remain at unsustainably high levels and further distressed debt exchanges or a restructuring are likely to happen. The rating could be downgraded if asset value erodes further. For consideration of an upgrade, Warren will need to substantially reduce financial leverage, and improve operating performance and liquidity.

28. On November 9, 2015, Warren issued a press release to announce its third quarter financial results. Buried deep into the press release was a one sentenced disclosure that "Warren does not expect to consummate the previously announced sale of [its Wyoming] assets… and is taking steps to terminate the agreements." The deal had been announced in June 2015, with an effective date of April 2015, and was a deal Warren had been counting on to reduce its growing debt.

29. In an effort to counter negative news reports regarding the Company and its increasing debt position, Peterson during the investor conference call on November 9, 2015 sought to reassure investors by falsely stating that "we do not anticipate needed any additional liquidity before the third quarter of 2016 if not beyond."

30. On November 16, 2015, Warren announced that Watt had been hired as CEO, replacing Peterson.

31. On February 1, 2016, Watt announced that Warren would not make a $7.5 million interest payment due on its 9% senior notes. While normally this would be (and should be)

considered bad news, Watt falsely reassured investors that electing to skip the interest payment was a "strategic decision… in anticipation of beginning a similarly constructive dialogue with our unsecure noteholders." He continued to soften the blow and falsely reassure investors that all of the financial maneuverings were positive events and not an attempt to stave off bankruptcy, saying:

> Our substantial cash position allows us to continue to meet all of our obligations to pay suppliers, employees and others, and to continue to fund our operations. We look forward to using the interest payment grace period to begin discussions aimed at achieving an improved capital structure that, in light of challenging commodity prices, would be viable in the long term and in the best interests of all of Warren's stakeholders, including our creditors, equity holders and employees.

32. Of course all of these statements had no basis in fact and were false when made. In fact, just one week later after trying to reassure Plaintiff and the rest of the investing public that the financial shenanigans were "strategic decisions," Watt admitted that Warren was in dire shape, and stated on February 9, 2016 that:

> These are difficult times for Warren and its industry peers… we must seek further concessions from our various debt holders and vendors to survive what is anticipated to be a lengthy downturn in commodity prices.

33. This was the last press release from Warren. Another director abandoned ship on March 1, 2016 (director Marcus C. Rowland resigned from the board, effective March 4, 2016, citing "personal reasons"), as the Company negotiated with its bondholders and lenders for a prepackaged bankruptcy.

34. On June 2, 2016, the Company filed a voluntary petition for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of Texas under the caption *In re Warren Resources, Inc., et al.*, Case No. 16-32760, wiping out the stockholders' interest.

## ADDITIONAL SCIENTER ALLEGATIONS

35. As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated concerning the financial well-being of Warren were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated in or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

## NO SAFE HARBOR

36. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements described in this Complaint. Many of the specific statements described herein were not identified as "forward-looking" when made. To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described herein, Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of AbbVie who knew that those statements were false when made.

## CLASS ACTION ALLEGATIONS

37. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class (the "Class") of all persons who purchased or otherwise acquired Warren common stock during the period November 4, 2014 and June 2, 2016 (the "Class Period"). Excluded from the Class are Defendants, the other officers and directors of

Warren during the Class Period, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

38. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Millions of shares of Warren Common stock were traded during the Class Period, likely owned by at least hundreds of persons and entities.

39. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) whether Defendants violated Section 10(b) of the Exchange Act;

(b) whether Defendants omitted and/or misrepresented material facts;

(c) whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether Defendants knew or deliberately disregarded that their statements were false and misleading;

(e) whether Defendants were controlling persons of Warren under Section 20(a) of the Exchange Act;

(f) whether the price of Warren common stock was artificially inflated; and

(g) the extent of damage sustained by Class members and the appropriate measure of damages.

40. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

41. Plaintiff will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

42. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE**

43. Throughout the Class Period, Warren common stock was actively traded on the NASDAQ securities markets, which were efficient markets that promptly digested current information with respect to Warren from publicly available sources and reflected such information in the prices of Warren's shares.

44. The evidence that Warren common stock traded on an efficient market at all relevant times includes the fact that Warren common stock was listed and actively traded on a highly efficient and automated market; that as a regulated issuer, Warren filed periodic public reports with the SEC and the NASDAQ; and that Warren regularly communicated with public investors and securities professionals via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

45. Based on these indicia, a presumption of reliance applies.

**LOSS CAUSATION/ECONOMIC LOSS**

46. The market for Warren common stock was open, well-developed, and efficient at all relevant times. As a result of Defendants' materially false and misleading statements and failures to disclose, Warren stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Warren common stock relying upon the

integrity of the market of Warren and market information related to the Company, and have been damaged thereby.

47. The material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants materially misled the investing public, thereby inflating the price of Warren stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make their own statements not false and misleading.

48. The materially false and/or misleading statements made by Defendants during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

49. As a result of their purchases of Warren common stock during the Class Period at artificially inflated prices, Plaintiff, and the other Class members suffered damages, under the federal securities laws.

50. The timing and magnitude of the price decline in Warren stock negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## COUNT ONE

**Against All Defendants for Violation of**
**Section 10(b) of the Exchange Act and Rule 10b-5**

51. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

52. Plaintiff asserts this Count pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, against Defendants, for the time that such Defendant was CEO of the Company.

53. During the Class Period, Defendants disseminated or approved the false statements set forth above, which they knew or deliberately disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

54. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) employed devices, schemes and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Warren common stock during the Class Period.

55. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Warren common stock. Plaintiff and the Class would not have purchased Warren common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**COUNT TWO**
**Against All Defendants for Controlling Person Liability**
**Under Section 20(a) of the Exchange Act**

56. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

57. Plaintiff asserts this Count pursuant to Section 20(a) of the Exchange Act against all defendants.

58. Defendants, by virtue of their leadership positions in Warren, had the power and authority to cause Warren to engage in the wrongful conduct complained of herein.

59. Defendants possessed the power and authority to control the contents of Warren's SEC filings and press releases.

60. Defendants violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in the Complaint, and as a direct and proximate result of those violations, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period.

61. By reason of their control of Warren, each of the Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations of Section 10(b) and Rule 10b-5 that occurred during the time that such Defendant was CEO of the Company.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A. Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B. Awarding Plaintiff and the members of the Class damages, including interest;

C. Awarding Plaintiff reasonable costs and attorneys' fees; and

D. Awarding Plaintiff such equitable/injunctive or other relief in Lead Plaintiffs' favor as the Court may deem just and proper.

## JURY DEMAND

Plaintiff, on behalf of himself and the Class, hereby demands a trial by jury.

Dated: August 11, 2016

**BURG SIMPSON**
**ELDREDGE HERSH & JARDINE, P.C.**

*/s/ Brian K. Matise*
Brian K. Matise
40 Inverness Drive East
Englewood, Colorado 80112
(303) 792-5595
(303) 708-0527
bmatise@burgsimpson.com

**GARDY & NOTIS, LLP**
Mark C. Gardy
James S. Notis
Jennifer Sarnelli
Tower 56
126 East 56th Street, 8th Floor
New York, NY 10022
Tel: 212-905-0509
Fax: 212-905-0508

***Counsel for Plaintiff***

# DECLARATION OF DAVID SPEISER

PURSUANT TO THE FEDERAL SECURITIES LAWS

I, David Speiser, certify that:

1. I have the authority to make material decisions including the authority to make the decision to initiate this litigation.

2. I have reviewed the complaint against certain officers and/or directors of Warren Resources, Inc. and authorize the firm set forth on the complaint to move on my behalf for appointment as lead plaintiff.

3. The security that is the subject of this action (Warren Resources, Inc. common stock) was not purchased at the direction of plaintiff's counsel, or in order to participate in any private action arising under this title.

4. I am willing to serve as a representative party on behalf of a class and I will testify at deposition and trial, if necessary.

5. My transactions in the security that is the subject of this litigation during the class period set forth in the complaint are as follows:

**SEE ATTACHMENT**

6. I have not served as or sought to serve as a representative party on behalf of a class under this title during the last three years.

7. I will not accept any payment for serving as a representative party, except to receive its pro rata share of any recovery or as ordered or approved by the court including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury to 28 U.S.C. §1746 that the foregoing is true and correct.

Executed this 21 day of July, 2016

Signed: [signature]

Scanned by CamScanner

**Class Period Purchases:**

| Date | Shares Bought | Price Per Share |
|---|---|---|
| November 26, 2014 | 1,500 | $ 2.65 |
| December 2, 2014 | 1,500 | $ 1.88 |
| December 10, 2014 | 1,500 | $ 1.43 |
| December 15, 2014 | 4,500 | $ 1.38 |
| January 6, 2015 | 5,000 | $ 1.45 |
| March 10, 2015 | 5,000 | $ 1.03 |
| May 28, 2015 | 6,329 | $ 0.78 |

**Class Period Sales: NONE**

Scanned by CamScanner